**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

NUTMEG INSURANCE COMPANY,           )
                                    )
                    Plaintiff,      )
                                    )
          v.                        )
                                    )
EAST LAKE MANAGEMENT &              )          05 C 1328
DEVELOPMENT CORPORATION             )
                                    )
                    Defendant.      )


**MEMORANDUM OPINION & ORDER**

This case is before the court for ruling on the parties'
cross-motions for summary judgment. For the reasons explained
below, the court grants summary judgment in favor of defendant and
against plaintiff.[1]

**BACKGROUND**

Plaintiff Nutmeg Insurance Company ("Nutmeg"), a Connecticut
corporation, is an insurance company that sells professional
liability insurance. Defendant East Lake Management & Development
Corporation ("East Lake"), an Illinois corporation engaged in the
business of owning, operating and managing residential apartment
buildings, is the insured under a professional liability insurance

---

[1] Defendant also filed a motion to strike plaintiff's Local Rule 56.1
Statement of Facts, challenging 21 of plaintiff's factual statements for various
reasons. Because the court did not consider the challenged factual statements
in ruling on the cross-motions for summary judgment, the motion to strike is
denied as moot.

policy issued by Nutmeg. The core issue presented in the cross-motions for summary judgment is whether that policy — Miscellaneous Professional Liability Insurance Policy No. NPG0130163, effective from July 15, 2000 to June 26, 2001 ("the Policy") — covers the amount paid to settle a state court lawsuit against East Lake.

**The Hale Lawsuit**

In November 2000, East Lake was named as a defendant in a lawsuit brought in the Circuit Court of Cook County, Chancery Division, captioned <u>Terrance Hale and Corliss Hale v. East Lake Management & Development Corp. and Urban Residential Services Co.</u>, 00 CH 16139 ("the Hale Lawsuit"). The Hale Lawsuit was a class action in which the tenant-plaintiffs alleged that defendants East Lake and Urban Residential Services ("Urban") violated the Chicago Residential Landlord and Tenant Ordinance ("RLTO") by (1) failing to pay interest on security deposits to tenants who resided in numerous Chicago apartment buildings, violating § 5-12-080© of RLTO, (2) failing to provide notice relating to the handling of security deposits to tenants who lived in an apartment building at 7000 South Shore Drive in Chicago ("7000 South Shore Drive") when management of that property was transferred from East Lake to Urban, violating § 5-12-080(e) of RLTO, and (3) failing to adequately maintain 7000 South Shore Drive, thus breaching the implied warranty of habitability and violating § 5-12-070 of RLTO. For the alleged failures to pay interest and to provide notice, the Hale plaintiffs sought recovery under § 5-12-080(f) of RLTO, which provides:

If the landlord or landlord's agent fails to comply with any provision of Section 5-12-080(a)-(e), the tenant shall be awarded damages in an amount equal to two times the security deposit plus interest at a rate determined in accordance with Section 5-12-081. This subsection does not preclude the tenant from recovering other damages to which he may be entitled under this chapter.

Chicago, Ill., Code § 5-12-080(f).[2]

Nutmeg provided the defense for East Lake in the Hale Lawsuit.[3] On May 27, 2005, following a settlement conference in the Hale Lawsuit, the Hale plaintiffs made a settlement demand to East Lake. The attorney hired by Nutmeg to defend East Lake conveyed the Hale plaintiffs' settlement demand to both East Lake and Nutmeg. That same day, East Lake, through other counsel, demanded that Nutmeg settle the Hale Lawsuit. Shortly thereafter, the Hale Lawsuit settled within Policy limits. On September 30, 2005, East Lake and the Hale plaintiffs executed a settlement agreement whereby East Lake agreed to settle all claims in the Hale Lawsuit for $439,625. As relevant here, the settlement agreement allocated $308,000 to East Lake tenants who were not timely paid or credited interest on their security deposits and who did not

---

[2] Section 5-12-080(f) provides for "interest at a rate determined in accordance with Section 5-12-081" not for "interest at five percent" as the parties submitted in their Local Rule 56.1 Statement of Facts. (See Nutmeg's L.R. 56.1 Statement of Facts ¶ 12 and East Lake's Resp.)

[3] According to Nutmeg, it defended East Lake subject to a full reservation of rights to later deny coverage, if appropriate. East Lake disagrees, contending that Nutmeg did not timely reserve its rights and has either waived or is estopped from asserting policy defenses. We need not determine whether Nutmeg properly reserved its rights, however, because even if it did, the settlement of the Hale Lawsuit is covered under the Policy for the reasons explained further below.

receive notice of the transfer of ownership of the subject buildings from East Lake to Urban, and $100,000 for attorneys' fees and costs.[4]  On or about April 21, 2006, Nutmeg paid the full amount due under the settlement agreement.

### The Declaratory Judgment Action

While the Hale Lawsuit was pending, Nutmeg filed the declaratory judgment action that is presently before the court. Originally, Nutmeg sought a declaration that none of the damages sought by the Hale plaintiffs were covered under the Policy.  East Lake responded by filing a counterclaim under 215 ILCS 5/155 alleging that Nutmeg had unreasonably and vexatiously delayed settling the Hale Lawsuit.  The Hale Lawsuit subsequently settled, as explained above.  Later, at the Rule 16 conference in this case, the parties agreed with the court that the most efficient way to proceed would be for Nutmeg to file for summary judgment on the declaratory judgment claim after the parties conducted any necessary discovery relating to that claim.  The parties' cross-motions for summary judgment regarding the declaratory judgment claim are now before the court for ruling.[5]

The Policy covers "Damages" and "Claims Expenses" that East Lake becomes legally obligated to pay as the result of claims made

---

[4] The remainder of the settlement was allocated as follows: $28,875 to class members who were tenants of 7000 South Shore Drive during the five years before the Hale Lawsuit commenced, and $2,750 to the class representatives for their services.

[5] East Lake's counterclaim is not at issue in the cross-motions for summary judgment.

against it for defined wrongful acts.[6]  The "Damages" definition
set forth in Section V.3 states:

> **"Damages"** means a compensatory monetary amount for which
> [East Lake] may be held legally liable, including
> judgments (inclusive of any pre- or post-judgment
> interest), awards, or settlements negotiated with the
> approval of [Nutmeg].
>
> **Damages** do not include:
>
> \* \* \* \* \* \* \*
>
>     (b) fines, sanctions, taxes, penalties or awards
> deemed uninsurable pursuant to any applicable law;
>
> \* \* \* \* \* \* \*
>
> **Damages** include punitive and/or exemplary damages or the
> multiple portion of any multiplied damage award unless
> such damages are uninsurable pursuant to applicable law.
> The insurability of such damages shall be governed by the
> internal laws of any applicable jurisdiction which
> permits coverage of such damages.

(Policy, Section V.3 (emphasis in original)).

In moving for summary judgment, Nutmeg seeks a declaration
that $408,000 of the settlement[7] — the $308,000 it paid to settle
the RLTO claims based on East Lake's alleged failure to pay
interest and failure to provide notice and the $100,000 paid for
attorneys' fees and costs — is not covered under the Policy, and
thus East Lake is obligated to reimburse that amount to Nutmeg.
East Lake, for its part, counters that the Hale Lawsuit settlement

---

[6] See Policy, Section I, p. 1 (Nutmeg's L.R. 56.1 Statement of Facts, Ex.
D) for the precise Policy language.

[7] Nutmeg concedes that a small portion of the $439,625 settlement is
covered under the Policy.

is covered under the Policy and consequently asks the court to grant summary judgment in its favor.[8]

## DISCUSSION

**A.    Summary Judgment Standard**

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."    Fed. R. Civ. P. 56©.    In considering such a motion, the court construes the evidence and all inferences that reasonably can be drawn therefrom in the light most favorable to the nonmoving party.    See Pitasi v. Gartner Group, Inc., 184 F.3d 709, 714 (7th Cir. 1999).    "Summary judgment should be denied if the dispute is 'genuine': 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'"    Talanda v. KFC Nat'l Mgmt. Co., 140 F.3d 1090, 1095 (7th Cir. 1998) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).    "[U]nless there is sufficient

---

[8]/   East Lake's cross-motion for summary judgment is essentially the mirror image of Nutmeg's motion — each side argues that it is entitled to summary judgment on the declaratory judgment claim.    For some inexplicable reason, rather than filing one brief responding to Nutmeg's motion and simultaneously seeking summary judgment in its favor, East Lake instead filed one brief opposing Nutmeg's motion for summary judgment and a second brief supporting its cross-motion for summary judgment on the declaratory judgment claim.    Nutmeg, in turn, filed separate briefs to reply and respond, respectively.    Instead of receiving three briefs in total, the court received three briefs from each party. This was unnecessary, repetitive and wasteful.

evidence favoring the nonmoving party for a jury to return a verdict for that party," there is no issue for trial. <u>Anderson</u>, 477 U.S. at 248.

**B.    Analysis**

   **1.    Applicable Law**

   In this case, there are no genuine issues of material fact precluding summary judgment on the declaratory judgment claim. Whether the challenged $408,000 settlement payment is covered depends on the language of the Policy.  Under Illinois law, which controls the outcome of the declaratory judgment claim, the construction of the terms of the Policy and the determination regarding the parties' rights and obligations under the Policy are questions of law that the court may decide on summary judgment. <u>Roman Catholic Diocese of Springfield in Ill. v. Maryland Cas. Co.</u>, 139 F.3d 561, 565 (7th Cir. 1998)(<u>citing</u> <u>Crum & Forster Managers Corp. v. Resolution Trust Corp.</u>, 620 N.E.2d 1073, 1077 (Ill. 1993)).  "A court's primary objective in construing the language of the policy is to ascertain and give effect to the intentions of the parties as expressed in their agreement." <u>Am. States Ins. Co. v. Koloms</u>, 687 N.E.2d 72, 75 (Ill. 1997).  If a policy provision is clear and unambiguous, it must be given its "plain and ordinary meaning."  <u>Id.</u>  Conversely, if a provision is reasonably susceptible to more than one interpretation, the provision is ambiguous and must be construed against the insurer and in favor of

the insured — *i.e.*, in favor of coverage.  <u>Id.</u>  Moreover, if the insurer is relying upon a provision that purports to limit or exclude coverage, the exclusion is enforceable "only where the terms are clear, definite, and explicit." <u>Econ. Fire & Cas. Co. v. Kubik</u>, 492 N.E.2d 504, 507 (Ill. App. Ct. 1986).  The insurer bears the burden of establishing that a claim falls within the exclusion. <u>Hurst-Roche Eng'rs v. Comm. Union Ins. Co.</u>, 51 F.3d 1336, 1342 (7th Cir. 1995).

### 2.   Summary of the Relevant Arguments

Nutmeg urges the court to grant summary judgment in its favor and find that $408,000 of the Hale settlement is not covered under the Policy.[9]  As explained above, the Hale settlement agreement allocated $308,000 to remedy East Lake's alleged failure to pay interest and failure to provide notice ("the § 5-12-080 Claims") and $100,000 for attorneys' fees and costs allowable under RLTO. According to Nutmeg, the remedy set forth in § 5-12-080(f) for violations of § 5-12-080 is a penalty, so the amount paid to settle the § 5-12-080 Claims constitutes a penalty and the Policy unambiguously excludes penalties from coverage.  Alternatively, Nutmeg contends that even if the amount paid to settle the § 5-12-080 Claims is not a penalty, such damages are uninsurable under Illinois law, and thus are not covered under the Policy.  Finally,

---

[9]  In its motion, Nutmeg specifically asks for summary judgment on counts I and II of its complaint.  But as East Lake points out, there are not two counts in Nutmeg's complaint.

in case the court does not find either of those arguments
persuasive, Nutmeg argues that $308,000 of the settlement payment
does not qualify as "Damages" because that amount either (a) is
excluded under Section V.3.a, or (b) constitutes reimbursement for
funds wrongfully withheld by East Lake and thus does is not an out-
of-pocket loss.[10]  East Lake, on the other hand, asks the court to
grant summary judgment in its favor on the coverage issue and
declare that the $408,000 payment is covered under the Policy.
Among the barrage of arguments submitted in support of its
position, East Lake contends that the "Damages" definition in the
Policy is ambiguous and therefore must be construed in favor of
coverage.[11]

### 3.    The Damages Definition is Ambiguous

Despite Nutmeg's arguments to the contrary, we agree with East
Lake that the "Damages" definition is ambiguous.  As set forth in
the Policy, "Damages" do not include "fines, sanctions, taxes,
penalties or awards deemed uninsurable pursuant to any applicable
law[.]" (Policy, Section V.3.)  Because the "Damages" definition
excludes certain types of damages from coverage, the exclusion is
enforceable "only where the terms are clear, definite, and
explicit."  Kubik, 492 N.E.2d at 507.  The threshold question is

---

[10]/  Nutmeg does not challenge the $100,000 paid for attorneys' fees and
costs in this argument.

[11]/  The remainder of East Lake's arguments — many of which miss the mark
or are difficult to follow — need not be discussed.

whether the phrase "deemed uninsurable pursuant to any applicable law" modifies only "awards" (as Nutmeg asserts) or modifies "penalties" (and "fines," "sanctions" and "taxes") as well (as East Lake contends).  A valid, plain-reading argument can be made for either party's interpretation.  As a result, because the language is susceptible to more than one reasonable interpretation, the language is ambiguous and must be construed in favor of coverage. Koloms, 687 N.E.2d at 75.

    Nutmeg's reliance on City Trust, Safe Deposit & Surety Co. of Philadelphia v. Lee, 68 N.E.2d 485, 485 (Ill. 1903) does not persuade the court to rule otherwise.  City Trust involved the scope of coverage under an indemnity bond that guarantied losses sustained by appellee Lee through "the dishonesty or any act of fraud of [Lee's employee] amounting to larceny or embezzlement[.]"[12] Id.  The court found it clear that the phrase "amounting to larceny or dishonesty" did not qualify the word "dishonesty," and thus rejected City Trust's argument to the

contrary.  Id.  In support of its decision, as Nutmeg notes, the City Trust court explained that "[i]n the construction of written instruments a qualifying phrase is to be confined to the last antecedent phrase unless there is something in the instrument which requires a different construction."  Id.

---

[12]/  It is not entirely clear from the opinion whether that is the precise language of the bond — that is the language in the opinion, but the court did not use quotation marks to indicate a direct quotation.

Nutmeg thus argues that under the "last antecedent" rule the phrase "deemed uninsurable pursuant to any applicable law" can only be read to modify "awards." We cannot agree. For one thing, Nutmeg ignores the fact that a key reason for the <u>City Trust</u> court's decision was that the terms of the bond should be "most strongly construed" against City Trust as the party who prepared the bond. <u>Id.</u> Thus, nothing in the <u>City Trust</u> opinion suggests that the "last antecedent" rule of construction trumps the rule that ambiguous terms should be construed against the drafter. More importantly, rules of construction are not relevant unless a court first determines that a term is ambiguous.[13] 17A C.J.S., Contracts § 303 (courts should resort to rules of construction only if the contract is ambiguous); 12A Ill. Law & Practice, Contracts § 231 (same). In other words, the court does not resort to rules of construction to determine whether an ambiguity exists. Here, the "Damages" definition is ambiguous because the language, on its face, is susceptible to more than one reasonable interpretation. <u>See</u> <u>Koloms</u>, 687 N.E.2d at 75. And under Illinois law, an ambiguous insurance provision must be construed against the insurer and in favor of the insured. <u>Id.</u>

---

[13]/ We do not find the <u>City Trust</u> decision instructive regarding determining whether a contract provision is ambiguous. In its short, four paragraph opinion, the <u>City Trust</u> court did not directly discuss whether the contract terminology at issue was ambiguous. Although its finding that the challenged phrase <u>clearly</u> did not modify "dishonesty" implies there was no ambiguity, the court then relied on rules of construction to support its finding. Yet if there was no ambiguity, there was no need to resort to rules of construction. 17A C.J.S., Contracts, § 302.

Because the "Damages" definition is ambiguous, we accept the
insured's reasonable interpretation that the phrase "deemed
uninsurable pursuant to any applicable law" modifies both
"penalties" and "awards." It therefore makes no difference whether
damages awarded under § 5-12-080(f) constitute a "penalty" (as
Nutmeg argues) or some other type of "award."[14] Regardless of how
the § 5-12-080(f) damages are labeled, the relevant question is
whether such damages are uninsurable under Illinois law as a matter
of public policy.

### 4. Damages Under § 5-12-080(f) Are Not Uninsurable Under Illinois Law

It is undisputed that the Policy bars coverage for damages
that are uninsurable under Illinois law. Accordingly, Nutmeg
asserts that whether § 5-12-080(f) damages are categorized as a
penalty or a multiplied damage award, such damages are not
insurable under Illinois law as a matter of public policy.
Nutmeg's position is unpersuasive, however, because no Illinois
court has found damages for a municipal ordinance violation, or
anything comparable, to be uninsurable as a matter of public
policy.

Nutmeg relies heavily on Beaver v. Country Mutual Insurance
Co., 420 N.E.2d 1058, 1061 (Ill. App. Ct. 1981), which held that

[14] If, on the other hand, the "Damages" definition had unambiguously
excluded all penalties, as Nutmeg argues, we would have to determine whether § 5-
12-080(f) damages constitute a penalty. Because a ruling on that issue is not
necessary to resolve this case, we decline to address it further.

"public policy prohibits insurance against liability for punitive damages that arise out of one's own misconduct." In reaching its decision, the court explained that the purpose of punitive damages is to punish and deter — a purpose that would not be served if the wrongdoer were allowed to shift the burden of the sanction to an insurance company. Id. at 1060. The court further reasoned: "It is not disputed that insurance against criminal fines or penalties would be void as violative of public policy. The same public policy should invalidate any contract of insurance against the civil punishment that punitive damages represent." Id. (citation and internal quotation marks omitted).

According to Nutmeg, the Beaver court's reasoning extends to § 5-12-080(f) damages as well. Specifically, Nutmeg contends that the damages available under RLTO are intended to deter landlords from taking advantage of their tenants and allowing insurance to cover such damages would undermine that purpose.[15] We reject this argument, however, because § 5-12-080(f) damages simply are not analogous to punitive damages. Punitive damages are recoverable only under exceptional, aggravating circumstances, such as for tortious conduct involving wilfulness, malice, wantonness, fraud,

---

[15]/ It is overly simplistic to argue that the purpose of RLTO is to deter or punish landlords. According to the Illinois Supreme Court, the purpose of RLTO is to protect tenants' rights regarding their security deposits, including the right to receive interest. Lawrence v. Regent Realty Group, Inc., 754 N.E.2d 334, 339 (Ill. 2001). The ordinance provides double the amount of the security deposit as damages because otherwise the amount owed is generally too small to justify litigation against the landlord. Id. The fact that the ordinance allows for multiplied damages does not automatically make it penal rather than remedial in nature.

violence or recklessness.  See generally 7 Ill. Law & Practice,
Damages § 57.  In contrast, damages amounting to two times the
security deposit are recoverable for every violation of § 5-12-080.
It makes no difference whether the landlord's failure to comply
with the ordinance was inadvertent or intentional — a landlord's
liability under § 5-12-080(f) for violating RLTO is absolute.
Lawrence v. Regent Realty Group, 754 N.E.2d 334, 340 (Ill. 2001)
(rejecting argument that double damages were recoverable only if
landlord acted wilfully).  Damages for a municipal ordinance
violation that are recoverable regardless of the circumstances are
not comparable to punitive damages that are recoverable only for
aggravated, egregious misconduct.  See also In re Corriea, 719 A.2d
1234, 1240-41 (D.C. Cir. 1998) (rejecting analogy of forfeiture
damages to punitive damages).  Nutmeg's reliance on Beaver is
therefore misplaced.[16]

Because Nutmeg cites no case holding that § 5-12-080(f)
damages (or any comparable damages) are uninsurable in Illinois as
a matter of public policy, we reject Nutmeg's argument.

_____

[16]/ Nutmeg's reliance on Crawford Laboratories, Inc. v. St. Paul Insurance
Co., 715 N.E. 2d 653, 659 (Ill. App. Ct. 1999), which followed Beaver in ruling
that Illinois public policy prohibits insurance for punitive damages arising out
of insured's misconduct, is similarly misplaced.  Nutmeg also cites Mortenson v.
National Union Fire Insurance Co., 249 F. 3d 667, 672 (7th Cir. 2001) a case in
which the Seventh Circuit suggested that it might be against public policy to
allow insurance to cover penalties for willful failure to pay income taxes.  But
Nutmeg fails to explain how a penalty for willful failure to pay income taxes is
sufficiently comparable to the damages available for a violation of § 5-12-080.
In any event, the Mortenson court ultimately did not decide whether the income
tax penalty was uninsurable as a matter of public policy.  Nutmeg's reliance on
Mortenson does not persuade us that Illinois courts would find § 5-12-080(f)
damages to be uninsurable for public policy reasons.

5.    **Damages Paid to Settle the § 5-12-080 Claims Are Not Otherwise Excluded from Coverage**

Nutmeg alternatively contends that the $308,000[17] portion of the Hale settlement that was allocated to remedy the § 5-12-080 Claims does not constitute "Damages" under the Policy because that portion either (a) falls within the exclusion set forth in Section V.3.a of the Policy, or (b) constitutes the return of wrongfully held funds, which are not damages. Neither contention is convincing, however.

Nutmeg first argues that because $308,000 of the Hale settlement payment constitutes the return of security deposits or interest wrongfully withheld, that portion of the settlement payment is excluded from coverage under Section V.3.a of the Policy, which states that "Damages" do not include "any return . . . of professional fees, profits or other charges." Section V.3.a excludes certain types of damages from coverage, so Nutmeg, as the insurer, must establish that the exclusion clearly applies. Hurst-Roche, 51 F.3d at 1342 (insurer bears burden of establishing that claim falls within exclusion); Kubik, 492 N.E.2d at 507 (exclusion applies only if "clear, definite and explicit"). Security deposits and interest clearly are not professional fees or profits. Nor is it clear that security deposits or interest qualify as "other charges" under Section V.3.a (and Nutmeg offers

_____

[17]/    As noted earlier, Nutmeg does not challenge the $100,000 paid for attorneys' fees and costs in this argument.

no reasoning or explanation).  In common parlance, a charge is "the price [or cost] demanded for a thing or service."  Webster's Third New International Dictionary 377 (1971); Black's Law Dictionary 248 (8th Ed. 2004).  In the context of Section V.3.a, "other charges" would be amounts that East Lake demanded for some thing or service, meaning that amounts paid to satisfy such charges would belong to East Lake.  A security deposit, in contrast, is not a charge because the money belongs to the tenant even though it is in East Lake's possession.  East Lake has no right to use the security deposit money (unless the tenant does something to warrant a charge against the deposit).  Similarly, the interest owed on the security deposits is not a charge demanded by East Lake – the interest was owed to the tenants, not to East Lake.  It thus seems evident that security deposits and interest are not "other charges."  Exclusions are narrowly construed and Nutmeg has failed to establish that the exclusion set forth in Section V.3.a clearly applies to the $308,000.

Next, relying primarily on Level 3 Communications, Inc. V. Federal Insurance Co., 272 F.3d 908, 910-11 (7th Cir. 2001), Nutmeg asserts that the return of a security deposit or interest owed constitutes the return of funds wrongfully withheld rather than an out-of-pocket loss to East Lake.  Consequently, in Nutmeg's view, such a refund does not qualify as "Damages" under the Policy.  This

argument is flawed, however, because <u>Level 3</u> is distinguishable from the case at bar.

In <u>Level 3</u>, the issue was whether a settlement in a securities-fraud case constituted a "loss" under a directors' and officers' liability policy.  In Illinois, the term "loss" in an insurance policy means a deprivation.  <u>Local 705 Int'l Bhd. of Teamsters Health & Welfare Fund v. Five Star Managers, L.L.C.</u>, 735 N.E.2d 679, 683 (Ill. App. Ct. 2000) (citing dictionary definition of "loss").  Restitution of ill-gotten gains "is not considered a 'loss' because it cannot 'create a deprivation any more so than any borrower can be said to suffer a deprivation from being required to repay an indebtedness.'"  <u>Id.</u>  Accordingly, in <u>Level 3</u> the Seventh Circuit held that an insured who makes restitution to a party has not incurred a "loss" for purposes of insurance.  <u>Level 3</u>, 272 F.3d at 910-911.  As the court reasoned, "[a]n insured incurs no loss within the meaning of the insurance contract by being compelled to return property that it had stolen, even if a more polite word than 'stolen' is used to characterize the claim for the property's return."  <u>Id.</u> at 911.

There are at least two reasons why <u>Level 3</u> does not control the outcome of this case.  First and foremost, unlike <u>Level 3</u>, the operative policy term in this case is "Damages" not "loss."  "Damages," as the <u>Level 3</u> court explicitly recognized, is a broader

term than "loss."[18] Id. at 910; see also, Limelight Productions, Inc. v. Limelight Studios, Inc., 60 F.3d 767, 769 (11th Cir. 1995) (construing "damages" broadly and rejecting argument that ill-gotten profits were not damages under insurance policy). Here, the Policy does not require East Lake to suffer a "loss" in order to recover "Damages" under the Policy. Nutmeg's contention that the $308,000 payment to the Hale plaintiffs was not an out-of-pocket loss to East Lake is therefore irrelevant.[19]

Moreover, § 5-12-080(f) damages are fundamentally different from the damages available in a securities-fraud case like the underlying case in Level 3. In that underlying case, plaintiffs sought the difference between the value of the their stock at the time of trial and the price they received for the stock from defendants. Id. at 910. The Level 3 court ruled that such damages, which are typical in securities fraud cases, are restitutionary because the purpose is to "deprive defendant of the net benefit of the unlawful act, the value of the unlawfully obtained stock minus the cost to the defendant of obtaining the stock. It is the equivalent of seeking to impress a constructive

---

18/ Although it attempted to distinguish Level 3, East Lake overlooked this point.

19/ East Lake contends that the $308,000 payment would be an out-of-pocket loss. Specifically, according to East Lake, because it already conveyed the security deposits and accrued interest for 7000 South Shore Drive to Urban, East Lake would end up paying twice. That may be true, although it is not clear that the facts relating to that issue are undisputed. (E.g., as Nutmeg points out, 7000 South Shore Drive was only one of numerous buildings at issue in the Hale lawsuit.) Regardless, we decline to decide whether the $308,000 constitutes a "loss" because it is not necessary in order to resolve the pending motions.

trust on the property in favor of the rightful owner." Id. at 911. For that reason, such damages do not amount to a "loss."

In contrast, damages under § 5-12-080(f) do not just deprive the landlord of the "net benefit of the unlawful act." Id. Under § 5-12-080(f), the landlord is liable for more than the present value of the amount wrongfully withheld — he is liable for two times the amount of the security deposit. Damages under § 5-12-080(f) thus provide more than restitution.

**6.    The $408,000 Settlement Payment Constitutes Damages under the Policy**

Because the "Damages" provision in the Policy is ambiguous, the provision must be construed in favor of coverage. Additionally, Nutmeg's arguments that damages under § 5-12-080(f) are uninsurable as a matter of Illinois public policy or are excluded from coverage under Section V.3.a are not persuasive and its contention that § 5-12-080(f) damages do not constitute a loss to East Lake is irrelevant. Accordingly, construing the ambiguous "Damages" provision in favor of East Lake, the court finds that the $408,000 settlement payment is covered under the Policy.

**CONCLUSION**

For the reasons explained above, the court denies Nutmeg's motion for summary judgment on Nutmeg's complaint for declaratory judgment and grants East Lake's cross-motion. The court declares that the Policy (Miscellaneous Professional Liability Insurance

Policy No. NPG0130163, effective from July 15, 2000 to June 26, 2001) covers the settlement made on behalf of East Lake in Terrance Hale and Corliss Hale v. East Lake Management & Development Corp. and Urban Residential Services Co., 00 CH 16139, in the Circuit Court of Cook County, so Nutmeg is solely responsible for the $408,000 settlement payment it made to the plaintiffs in that case and East Lake has no obligation to reimburse Nutmeg for any portion of that payment.

DATED:    November 21, 2006


ENTER:    _____
          John F. Grady, United States District Judge