**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| NUTMEG INSURANCE COMPANY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| EAST LAKE MANAGEMENT & | ) | 05 C 1328 |
| DEVELOPMENT CORPORATION | ) | |
| | ) | |
| Defendant. | ) | |

**CORRECTED MEMORANDUM OPINION & ORDER**

This case is before the court for ruling on the parties'
cross-motions for summary judgment.  For the reasons explained
below, the court grants summary judgment in favor of defendant
and against plaintiff.[1]

**BACKGROUND**

Plaintiff Nutmeg Insurance Company ("Nutmeg"), a Connecticut
corporation, is an insurance company that sells professional
liability insurance. Defendant East Lake Management & Development
Corporation ("East Lake"), an Illinois corporation engaged in the
business of owning, operating and managing residential apartment
buildings, is the insured under a professional liability

---

[1] Defendant also filed a motion to strike plaintiff's Local Rule 56.1
Statement of Facts, challenging 21 of plaintiff's factual statements for various
reasons.  Because the court did not consider the challenged factual statements
in ruling on the cross-motions for summary judgment, the motion to strike is
denied as moot.

insurance policy issued by Nutmeg. The core issue presented in the cross-motions for summary judgment is whether that policy — Miscellaneous Professional Liability Insurance Policy No. NPG0130163, effective from July 15, 2000 to June 26, 2001 ("the Policy") — covers the amount paid to settle a state court lawsuit against East Lake.

**The Hale Lawsuit**

In November 2000, East Lake was named as a defendant in a lawsuit brought in the Circuit Court of Cook County, Chancery Division, captioned <u>Terrance Hale and Corliss Hale v. East Lake Management & Development Corp. and Urban Residential Services Co.</u>, 00 CH 16139 ("the Hale Lawsuit"). The Hale Lawsuit was a class action in which the tenant-plaintiffs alleged that defendants East Lake and Urban Residential Services ("Urban") violated the Chicago Residential Landlord and Tenant Ordinance ("RLTO") by (1) failing to pay interest on security deposits to tenants who resided in numerous Chicago apartment buildings, violating § 5-12-080(c) of RLTO, (2) failing to provide notice relating to the handling of security deposits to tenants who lived in an apartment building at 7000 South Shore Drive in Chicago ("7000 South Shore Drive") when management of that property was transferred from East Lake to Urban, violating § 5-12-080(e) of RLTO, and (3) failing to adequately maintain 7000 South Shore Drive, thus breaching the implied warranty of habitability and violating § 5-12-070 of RLTO. For the alleged failures to pay interest and to provide notice, the Hale

plaintiffs sought recovery under § 5-12-080(f) of RLTO, which
provides:

> If the landlord or landlord's agent fails to comply
> with any provision of Section 5-12-080(a)-(e), the
> tenant shall be awarded damages in an amount equal to
> two times the security deposit plus interest at a rate
> determined in accordance with Section 5-12-081. This
> subsection does not preclude the tenant from recovering
> other damages to which he may be entitled under this
> chapter.

Chicago, Ill., Code § 5-12-080(f).[2]

Nutmeg provided the defense for East Lake in the Hale
Lawsuit.[3] On May 27, 2005, following a settlement conference in
the Hale Lawsuit, the Hale plaintiffs made a settlement demand to
East Lake. The attorney hired by Nutmeg to defend East Lake
conveyed the Hale plaintiffs' settlement demand to both East Lake
and Nutmeg. That same day, East Lake, through other counsel,
demanded that Nutmeg settle the Hale Lawsuit. Shortly
thereafter, the Hale Lawsuit settled within Policy limits. On
September 30, 2005, East Lake and the Hale plaintiffs executed a
settlement agreement whereby East Lake agreed to settle all
claims in the Hale Lawsuit for $439,625. As relevant here, the

---

[2] Section 5-12-080(f) provides for "interest at a rate determined in
accordance with Section 5-12-081" not for "interest at five percent" as the
parties submitted in their Local Rule 56.1 Statement of Facts. (See Nutmeg's
L.R. 56.1 Statement of Facts ¶ 12 and East Lake's Resp.)

[3] According to Nutmeg, it defended East Lake subject to a full
reservation of rights to later deny coverage, if appropriate. East Lake
disagrees, contending that Nutmeg did not timely reserve its rights and has
either waived or is estopped from asserting policy defenses. We need not
determine whether Nutmeg properly reserved its rights, however, because even if
it did, the settlement of the Hale Lawsuit is covered under the Policy for the
reasons explained further below.

settlement agreement allocated $308,000 to East Lake tenants who were not timely paid or credited interest on their security deposits and who did not receive notice of the transfer of ownership of the subject buildings from East Lake to Urban, and $100,000 for attorneys' fees and costs.[4]  On or about April 21, 2006, Nutmeg paid the full amount due under the settlement agreement.

**The Declaratory Judgment Action**

While the Hale Lawsuit was pending, Nutmeg filed the declaratory judgment action that is presently before the court. Originally, Nutmeg sought a declaration that none of the damages sought by the Hale plaintiffs were covered under the Policy. East Lake responded by filing a counterclaim under 215 ILCS 5/155 alleging that Nutmeg had unreasonably and vexatiously delayed settling the Hale Lawsuit.  The Hale Lawsuit subsequently settled, as explained above.  Later, at the Rule 16 conference in this case, the parties agreed with the court that the most efficient way to proceed would be for Nutmeg to file for summary judgment on the declaratory judgment claim after the parties conducted any necessary discovery relating to that claim.  The

---

[4]  The remainder of the settlement was allocated as follows: $28,875 to class members who were tenants of 7000 South Shore Drive during the five years before the Hale Lawsuit commenced, and $2,750 to the class representatives for their services.

parties' cross-motions for summary judgment regarding the

declaratory judgment claim are now before the court for ruling.[5]

The Policy covers "Damages" and "Claims Expenses" that East

Lake becomes legally obligated to pay as the result of claims

made against it for defined wrongful acts.[6]  The "Damages"

definition set forth in Section V.3 states:

> **"Damages"** means a compensatory monetary amount for
> which [East Lake] may be held legally liable, including
> judgments (inclusive of any pre- or post-judgment
> interest), awards, or settlements negotiated with the
> approval of [Nutmeg].
>
> **Damages** do not include:
>
> * * * * * * *
>
> (b) fines, sanctions, taxes, penalties or awards
> deemed uninsurable pursuant to any applicable law;
>
> * * * * * * *
>
> **Damages** include punitive and/or exemplary damages or
> the multiple portion of any multiplied damage award
> unless such damages are uninsurable pursuant to
> applicable law.  The insurability of such damages shall
> be governed by the internal laws of any applicable
> jurisdiction which permits coverage of such damages.

(Policy, Section V.3 (emphasis in original)).

In moving for summary judgment, Nutmeg seeks a declaration

that $408,000 of the settlement[7] — the $308,000 it paid to settle

---

[5]  East Lake's counterclaim is not at issue in the cross-motions for summary judgment.

[6]  See Policy, Section I, p. 1 (Nutmeg's L.R. 56.1 Statement of Facts, Ex. D) for the precise Policy language.

[7]  Nutmeg concedes that a small portion of the $439,625 settlement is covered under the Policy.

the RLTO claims based on East Lake's alleged failure to pay
interest and failure to provide notice and the $100,000 paid for
attorneys' fees and costs — is not covered under the Policy, and
thus East Lake is obligated to reimburse that amount to Nutmeg.
East Lake, for its part, counters that the Hale Lawsuit
settlement is covered under the Policy and consequently asks the
court to grant summary judgment in its favor.[8]

## DISCUSSION

### A.    Summary Judgment Standard

Under Rule 56 of the Federal Rules of Civil Procedure,
summary judgment is proper "if the pleadings, depositions,
answers to interrogatories, and admissions on file, together with
the affidavits, if any, show that there is no genuine issue as to
any material fact and that the moving party is entitled to
judgment as a matter of law." Fed. R. Civ. P. 56(c).  In
considering such a motion, the court construes the evidence and
all inferences that reasonably can be drawn therefrom in the
light most favorable to the nonmoving party.  See Pitasi v.
Gartner Group, Inc., 184 F.3d 709, 714 (7th Cir. 1999).  "Summary

---

[8]/   East Lake's cross-motion for summary judgment is essentially the mirror
image of Nutmeg's motion — each side argues that it is entitled to summary
judgment on the declaratory judgment claim.  For some inexplicable reason, rather
than filing one brief responding to Nutmeg's motion and simultaneously seeking
summary judgment in its favor, East Lake instead filed one brief opposing
Nutmeg's motion for summary judgment and a second brief supporting its cross-
motion for summary judgment on the declaratory judgment claim.  Nutmeg, in turn,
filed separate briefs to reply and respond, respectively.  Instead of receiving
three briefs in total, the court received three briefs from each party. This was
unnecessary, repetitive and wasteful.

judgment should be denied if the dispute is 'genuine': 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'"  Talanda v. KFC Nat'l Mgmt. Co., 140 F.3d 1090, 1095 (7th Cir. 1998) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).  "[U]nless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party," there is no issue for trial.  Anderson, 477 U.S. at 248.

**B.  Analysis**

    **1.  Applicable Law**

In this case, there are no genuine issues of material fact precluding summary judgment on the declaratory judgment claim.  Whether the challenged $408,000 settlement payment is covered depends on the language of the Policy.  Under Illinois law, which controls the outcome of the declaratory judgment claim, the construction of the terms of the Policy and the determination regarding the parties' rights and obligations under the Policy are questions of law that the court may decide on summary judgment.  Roman Catholic Diocese of Springfield in Ill. v. Maryland Cas. Co., 139 F.3d 561, 565 (7th Cir. 1998)(citing Crum & Forster Managers Corp. v. Resolution Trust Corp., 620 N.E.2d 1073, 1077 (Ill. 1993)).  "A court's primary objective in construing the language of the policy is to ascertain and give effect to the intentions of the parties as expressed in their

agreement." <u>Am. States Ins. Co. v. Koloms</u>, 687 N.E.2d 72, 75 (Ill. 1997). If a policy provision is clear and unambiguous, it must be given its "plain and ordinary meaning." <u>Id.</u> Conversely, if a provision is reasonably susceptible to more than one interpretation, the provision is ambiguous and must be construed against the insurer and in favor of the insured — <u>i.e.</u>, in favor of coverage. <u>Id.</u> Moreover, if the insurer is relying upon a provision that purports to limit or exclude coverage, the exclusion is enforceable "only where the terms are clear, definite, and explicit." <u>Econ. Fire & Cas. Co. v. Kubik</u>, 492 N.E.2d 504, 507 (Ill. App. Ct. 1986). The insurer bears the burden of establishing that a claim falls within the exclusion. <u>Hurst-Roche Eng'rs v. Comm. Union Ins. Co.</u>, 51 F.3d 1336, 1342 (7th Cir. 1995).

### 2. Summary of the Relevant Arguments

Nutmeg urges the court to grant summary judgment in its favor and find that $408,000 of the Hale settlement is not covered under the Policy.[9] As explained above, the Hale settlement agreement allocated $308,000 to remedy East Lake's alleged failure to pay interest and failure to provide notice ("the § 5-12-080 Claims") and $100,000 for attorneys' fees and costs allowable under RLTO. According to Nutmeg, the remedy set

---

[9] In its motion, Nutmeg specifically asks for summary judgment on counts I and II of its complaint. But as East Lake points out, there are not two counts in Nutmeg's complaint.

forth in § 5-12-080(f) for violations of § 5-12-080 is a penalty, so the amount paid to settle the § 5-12-080 Claims constitutes a penalty and the Policy unambiguously excludes penalties from coverage.  Alternatively, Nutmeg contends that even if the amount paid to settle the § 5-12-080 Claims is not a penalty, such damages are uninsurable under Illinois law, and thus are not covered under the Policy.  Finally, in case the court does not find either of those arguments persuasive, Nutmeg argues that $308,000 of the settlement payment does not qualify as "Damages" because that amount either (a) is excluded under Section V.3.a, or (b) constitutes reimbursement for funds wrongfully withheld by East Lake and thus does is not an out-of-pocket loss.[10]  East Lake, on the other hand, asks the court to grant summary judgment in its favor on the coverage issue and declare that the $408,000 payment is covered under the Policy.  Among the barrage of arguments submitted in support of its position, East Lake contends that the "Damages" definition in the Policy is ambiguous and therefore must be construed in favor of coverage.[11]

### 3.   The Damages Definition is Ambiguous

Despite Nutmeg's arguments to the contrary, we agree with East Lake that the "Damages" definition is ambiguous.  As set

---

[10]  Nutmeg does not challenge the $100,000 paid for attorneys' fees and costs in this argument.

[11]  The remainder of East Lake's arguments — many of which miss the mark or are difficult to follow — need not be discussed.

forth in the Policy, "Damages" do not include "fines, sanctions, taxes, penalties or awards deemed uninsurable pursuant to any applicable law[.]" (Policy, Section V.3.)  Because the "Damages" definition excludes certain types of damages from coverage, the exclusion is enforceable "only where the terms are clear, definite, and explicit." <u>Kubik</u>, 492 N.E.2d at 507.  The threshold question is whether the phrase "deemed uninsurable pursuant to any applicable law" modifies only "awards" (as Nutmeg asserts) or modifies "penalties" (and "fines," "sanctions" and "taxes") as well (as East Lake contends).  A valid, plain-reading argument can be made for either party's interpretation.  As a result, because the language is susceptible to more than one reasonable interpretation, the language is ambiguous and must be construed in favor of coverage.  <u>Koloms</u>, 687 N.E.2d at 75.

Nutmeg's reliance on <u>City Trust, Safe Deposit & Surety Co. of Philadelphia v. Lee</u>, 68 N.E.2d 485, 485 (Ill. 1903) does not persuade the court to rule otherwise.  <u>City Trust</u> involved the scope of coverage under an indemnity bond that guarantied losses sustained by appellee Lee through "the dishonesty or any act of fraud of [Lee's employee] amounting to larceny or embezzlement[.]"[12]  <u>Id.</u>  The court found it clear that the phrase

---

[12]/  It is not entirely clear from the opinion whether that is the precise language of the bond — that is the language in the opinion, but the court did not use quotation marks to indicate a direct quotation.

"amounting to larceny or dishonesty" did not qualify the word
"dishonesty," and thus rejected City Trust's argument to the
contrary.  Id.  In support of its decision, as Nutmeg notes, the
City Trust court explained that "[i]n the construction of written
instruments a qualifying phrase is to be confined to the last
antecedent phrase unless there is something in the instrument
which requires a different construction."  Id.

Nutmeg thus argues that under the "last antecedent" rule the
phrase "deemed uninsurable pursuant to any applicable law" can
only be read to modify "awards."  We cannot agree.  For one
thing, Nutmeg ignores the fact that a key reason for the City
Trust court's decision was that the terms of the bond should be
"most strongly construed" against City Trust as the party who
prepared the bond.  Id.  Thus, nothing in the City Trust opinion
suggests that the "last antecedent" rule of construction trumps
the rule that ambiguous terms should be construed against the
drafter.  More importantly, rules of construction are not
relevant unless a court first determines that a term is
ambiguous.[13]  17A C.J.S., Contracts § 303 (courts should resort
to rules of construction only if the contract is ambiguous); 12A

---

[13]/  We do not find the City Trust decision instructive regarding
determining whether a contract provision is ambiguous.  In its short, four
paragraph opinion, the City Trust court did not directly discuss whether the
contract terminology at issue was ambiguous.  Although its finding that the
challenged phrase clearly did not modify "dishonesty" implies there was no
ambiguity, the court then relied on rules of construction to support its finding.
Yet if there was no ambiguity, there was no need to resort to rules of
construction.  17A C.J.S., Contracts, § 302.

Ill. Law & Practice, Contracts § 231 (same). In other words, the
court does not resort to rules of construction to determine
whether an ambiguity exists. Here, the "Damages" definition is
ambiguous because the language, on its face, is susceptible to
more than one reasonable interpretation. <u>See</u> <u>Koloms</u>, 687 N.E.2d
at 75. And under Illinois law, an ambiguous insurance provision
must be construed against the insurer and in favor of the
insured. <u>Id.</u>

Because the "Damages" definition is ambiguous, we accept the
insured's reasonable interpretation that the phrase "deemed
uninsurable pursuant to any applicable law" modifies both
"penalties" and "awards." It therefore makes no difference
whether damages awarded under § 5-12-080(f) constitute a
"penalty" (as Nutmeg argues) or some other type of "award."[14]
Regardless of how the § 5-12-080(f) damages are labeled, the
relevant question is whether such damages are uninsurable under
Illinois law as a matter of public policy.

### 4. Damages Under § 5-12-080(f) Are Not Uninsurable Under Illinois Law

It is undisputed that the Policy bars coverage for damages
that are uninsurable under Illinois law. Accordingly, Nutmeg
asserts that whether § 5-12-080(f) damages are categorized as a

---

[14]/ If, on the other hand, the "Damages" definition had unambiguously
excluded all penalties, as Nutmeg argues, we would have to determine whether § 5-
12-080(f) damages constitute a penalty. Because a ruling on that issue is not
necessary to resolve this case, we decline to address it further.

penalty or a multiplied damage award, such damages are not insurable under Illinois law as a matter of public policy. Nutmeg's position is unpersuasive, however, because no Illinois court has found damages for a municipal ordinance violation, or anything comparable, to be uninsurable as a matter of public policy.

Nutmeg relies heavily on <u>Beaver v. Country Mutual Insurance Co.</u>, 420 N.E.2d 1058, 1061 (Ill. App. Ct. 1981), which held that "public policy prohibits insurance against liability for punitive damages that arise out of one's own misconduct." In reaching its decision, the court explained that the purpose of punitive damages is to punish and deter — a purpose that would not be served if the wrongdoer were allowed to shift the burden of the sanction to an insurance company. <u>Id.</u> at 1060. The court further reasoned: "It is not disputed that insurance against criminal fines or penalties would be void as violative of public policy. The same public policy should invalidate any contract of insurance against the civil punishment that punitive damages represent." <u>Id.</u> (citation and internal quotation marks omitted).

According to Nutmeg, the <u>Beaver</u> court's reasoning extends to § 5-12-080(f) damages as well. Specifically, Nutmeg contends that the damages available under RLTO are intended to deter landlords from taking advantage of their tenants and allowing

insurance to cover such damages would undermine that purpose.[15]
We reject this argument, however, because § 5-12-080(f) damages
simply are not analogous to punitive damages.  Punitive damages
are recoverable only under exceptional, aggravating
circumstances, such as for tortious conduct involving wilfulness,
malice, wantonness, fraud, violence or recklessness.  <u>See</u>
<u>generally</u> 7 Ill. Law & Practice, Damages § 57.  In contrast,
damages amounting to two times the security deposit are
recoverable for every violation of § 5-12-080.  It makes no
difference whether the landlord's failure to comply with the
ordinance was inadvertent or intentional — a landlord's liability
under § 5-12-080(f) for violating RLTO is absolute.  <u>Lawrence v.</u>
<u>Regent Realty Group</u>, 754 N.E.2d 334, 340 (Ill. 2001) (rejecting
argument that double damages were recoverable only if landlord
acted wilfully).  Damages for a municipal ordinance violation
that are recoverable regardless of the circumstances are not
comparable to punitive damages that are recoverable only for
aggravated, egregious misconduct.  <u>See also</u> <u>In re Corriea</u>, 719
A.2d 1234, 1240-41 (D.C. Cir. 1998) (rejecting analogy of

---

[15]/  It is overly simplistic to argue that the purpose of RLTO is to deter
or punish landlords.  According to the Illinois Supreme Court, the purpose of
RLTO is to protect tenants' rights regarding their security deposits, including
the right to receive interest.  <u>Lawrence v. Regent Realty Group, Inc.</u>, 754 N.E.2d
334, 339 (Ill. 2001).  The ordinance provides double the amount of the security
deposit as damages because otherwise the amount owed is generally too small to
justify litigation against the landlord.  <u>Id.</u>  The fact that the ordinance allows
for multiplied damages does not automatically make it penal rather than remedial
in nature.

forfeiture damages to punitive damages).  Nutmeg's reliance on
Beaver is therefore misplaced.[16]

Because Nutmeg cites no case holding that § 5-12-080(f)
damages (or any comparable damages) are uninsurable in Illinois
as a matter of public policy, we reject Nutmeg's argument.

**5.    Damages Paid to Settle the § 5-12-080 Claims Are Not
Otherwise Excluded from Coverage**

Nutmeg alternatively contends that the $308,000[17] portion of
the Hale settlement that was allocated to remedy the § 5-12-080
Claims does not constitute "Damages" under the Policy because
that portion either (a) falls within the exclusion set forth in
Section V.3.a of the Policy, or (b) constitutes the return of
wrongfully held funds, which are not damages.  Neither contention
is convincing, however.

Nutmeg first argues that because $308,000 of the Hale
settlement payment constitutes the return of security deposits or
interest wrongfully withheld, that portion of the settlement

---

[16]/  Nutmeg's reliance on Crawford Laboratories, Inc. v. St. Paul Insurance
Co., 715 N.E. 2d 653, 659 (Ill. App. Ct. 1999), which followed Beaver in ruling
that Illinois public policy prohibits insurance for punitive damages arising out
of insured's misconduct, is similarly misplaced.  Nutmeg also cites Mortenson v.
National Union Fire Insurance Co., 249 F. 3d 667, 672 (7th Cir. 2001) a case in
which the Seventh Circuit suggested that it might be against public policy to
allow insurance to cover penalties for willful failure to pay income taxes.  But
Nutmeg fails to explain how a penalty for willful failure to pay income taxes is
sufficiently comparable to the damages available for a violation of § 5-12-080.
In any event, the Mortenson court ultimately did not decide whether the income
tax penalty was uninsurable as a matter of public policy.  Nutmeg's reliance on
Mortenson does not persuade us that Illinois courts would find § 5-12-080(f)
damages to be uninsurable for public policy reasons.

[17]/  As noted earlier, Nutmeg does not challenge the $100,000 paid for
attorneys' fees and costs in this argument.

payment is excluded from coverage under Section V.3.a of the Policy, which states that "Damages" do not include "any return . . . of professional fees, profits or other charges." Section V.3.a excludes certain types of damages from coverage, so Nutmeg, as the insurer, must establish that the exclusion clearly applies. Hurst-Roche, 51 F.3d at 1342 (insurer bears burden of establishing that claim falls within exclusion); Kubik, 492 N.E.2d at 507 (exclusion applies only if "clear, definite and explicit"). Security deposits and interest clearly are not professional fees or profits. Nor is it clear that security deposits or interest qualify as "other charges" under Section V.3.a (and Nutmeg offers no reasoning or explanation). In common parlance, a charge is "the price [or cost] demanded for a thing or service." Webster's Third New International Dictionary 377 (1971); Black's Law Dictionary 248 (8th Ed. 2004). In the context of Section V.3.a, "other charges" would be amounts that East Lake demanded for some thing or service, meaning that amounts paid to satisfy such charges would belong to East Lake. A security deposit, in contrast, is not a charge because the money belongs to the tenant even though it is in East Lake's possession. East Lake has no right to use the security deposit money (unless the tenant does something to warrant a charge against the deposit). Similarly, the interest owed on the security deposits is not a charge demanded by East Lake – the

interest was owed to the tenants, not to East Lake. It thus seems evident that security deposits and interest are not "other charges." Exclusions are narrowly construed and Nutmeg has failed to establish that the exclusion set forth in Section V.3.a clearly applies to the $308,000.

Next, relying primarily on <u>Level 3 Communications, Inc. v. Federal Insurance Co.</u>, 272 F.3d 908, 910-11 (7th Cir. 2001), Nutmeg asserts that the return of a security deposit or interest owed constitutes the return of funds wrongfully withheld rather than an out-of-pocket loss to East Lake. Consequently, in Nutmeg's view, such a refund does not qualify as "Damages" under the Policy. This argument is flawed, however, because <u>Level 3</u> is distinguishable from the case at bar.

In <u>Level 3</u>, the issue was whether a settlement in a securities-fraud case constituted a "loss" under a directors' and officers' liability policy. In Illinois, the term "loss" in an insurance policy means a deprivation. <u>Local 705 Int'l Bhd. of Teamsters Health & Welfare Fund v. Five Star Managers, L.L.C.</u>, 735 N.E.2d 679, 683 (Ill. App. Ct. 2000) (citing dictionary definition of "loss"). Restitution of ill-gotten gains "is not considered a 'loss' because it cannot 'create a deprivation any more so than any borrower can be said to suffer a deprivation from being required to repay an indebtedness.'" <u>Id.</u> Accordingly, in <u>Level 3</u> the Seventh Circuit held that an insured

who makes restitution to a party has not incurred a "loss" for purposes of insurance.  <u>Level 3</u>, 272 F.3d at 910-911.  As the court reasoned, "[a]n insured incurs no loss within the meaning of the insurance contract by being compelled to return property that it had stolen, even if a more polite word than 'stolen' is used to characterize the claim for the property's return."  <u>Id.</u> at 911.

There are at least two reasons why <u>Level 3</u> does not control the outcome of this case.  First and foremost, unlike <u>Level 3</u>, the operative policy term in this case is "Damages" not "loss."  "Damages," as the <u>Level 3</u> court explicitly recognized, is a broader term than "loss."[18]  <u>Id.</u> at 910; <u>see also</u>, <u>Limelight Productions, Inc. v. Limelight Studios, Inc.</u>, 60 F.3d 767, 769 (11th Cir. 1995) (construing "damages" broadly and rejecting argument that ill-gotten profits were not damages under insurance policy).  Here, the Policy does not require East Lake to suffer a "loss" in order to recover "Damages" under the Policy.  Nutmeg's contention that the $308,000 payment to the Hale plaintiffs was not an out-of-pocket loss to East Lake is therefore irrelevant.[19]

---

[18]/  Although it attempted to distinguish <u>Level 3</u>, East Lake overlooked this point.

[19]/  East Lake contends that the $308,000 payment would be an out-of-pocket loss.  Specifically, according to East Lake, because it already conveyed the security deposits and accrued interest for 7000 South Shore Drive to Urban, East Lake would end up paying twice.  That may be true, although it is not clear that the facts relating to that issue are undisputed.  (<u>E.g.</u>, as Nutmeg points out, 7000 South Shore Drive was only one of numerous buildings at issue in the Hale lawsuit.)  Regardless, we decline to decide whether the $308,000 constitutes a "loss" because it is not necessary in order to resolve the pending motions.

Moreover, § 5-12-080(f) damages are fundamentally different from the damages available in a securities-fraud case like the underlying case in <u>Level 3</u>.  In that underlying case, plaintiffs sought the difference between the value of the their stock at the time of trial and the price they received for the stock from defendants.  <u>Id.</u> at 910.  The <u>Level 3</u> court ruled that such damages, which are typical in securities fraud cases, are restitutionary because the purpose is to "deprive defendant of the net benefit of the unlawful act, the value of the unlawfully obtained stock minus the cost to the defendant of obtaining the stock.  It is the equivalent of seeking to impress a constructive trust on the property in favor of the rightful owner."  <u>Id.</u> at 911.  For that reason, such damages do not amount to a "loss."

In contrast, damages under § 5-12-080(f) do not just deprive the landlord of the "net benefit of the unlawful act."  <u>Id.</u> Under § 5-12-080(f), the landlord is liable for more than the present value of the amount wrongfully withheld — he is liable for two times the amount of the security deposit.  Damages under § 5-12-080(f) thus provide more than restitution.

**7.  The $408,000 Settlement Payment Constitutes Damages under the Policy**

Because the "Damages" provision in the Policy is ambiguous, the provision must be construed in favor of coverage. Additionally, Nutmeg's arguments that damages under § 5-12-080(f) are uninsurable as a matter of Illinois public policy or are

excluded from coverage under Section V.3.a are not persuasive and its contention that § 5-12-080(f) damages do not constitute a loss to East Lake is irrelevant. Accordingly, construing the ambiguous "Damages" provision in favor of East Lake, the court finds that the $408,000 settlement payment is covered under the Policy.

**CONCLUSION**

For the reasons explained above, the court denies Nutmeg's motion for summary judgment on Nutmeg's complaint for declaratory judgment and grants East Lake's cross-motion. The court declares that the Policy (Miscellaneous Professional Liability Insurance Policy No. NPG0130163, effective from July 15, 2000 to June 26, 2001) covers the settlement made on behalf of East Lake in Terrance Hale and Corliss Hale v. East Lake Management & Development Corp. and Urban Residential Services Co., 00 CH 16139, in the Circuit Court of Cook County, so Nutmeg is solely responsible for the $408,000 settlement payment it made to the plaintiffs in that case and East Lake has no obligation to reimburse Nutmeg for any portion of that payment.

DATED:     November 22, 2006


ENTER:
_____
John F. Grady, United States District Judge